**IN THE UNITED STATES BANKRUPTCY COURT FOR THE
EASTERN DISTRICT OF TENNESSEE**

In re

JACQUELINE STANFILL
dba STANFILL WEALTH MANAGEMENT, LLC

        Debtor

Case No. 3:15-bk-30233-SHB

**MEMORANDUM ON
SECOND AMENDED MOTION TO COMPROMISE**

**APPEARANCES:**    LITTLE & MILLIGAN, PLLC
        F. Scott Milligan, Esq.
        900 E. Hill Avenue
        Suite 130
        Knoxville, Tennessee  37915
        Attorneys for W. Grey Steed, Chapter 7 Trustee

        WOLFE, MCCLANE, BRIGHT, ALLEN & CARPENTER, PLLC
        Gregory S. Logue, Esq.
        900 S. Gay Street
        Suite 900
        Knoxville, Tennessee  37902
        Attorneys for Cary M. Franklin, Karen A. Franklin, Ph.D, The Franklin
        Group, LLC, and Daniel D'All

        LONG, RAGSDALE & WATERS, P.C.
        Garrett P. Swartwood, Esq.
        1111 Northshore Drive
        Suite S-700
        Knoxville, Tennessee  37919-4074
        Attorneys for The Susan L. Miller Special Needs Trust, The Miller
        Family Trust, The Miller Survivor's Trust, and Adrienne Paige Miller

        QUIST, CONE & FISHER, PLLC
        Michael H. Fitzpatrick, Esq.
        2121 First Tennessee Plaza
        Knoxville, Tennessee  37929
        Attorneys for Regina Lambert

**SUZANNE H. BAUKNIGHT
UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the Motion to Compromise, as twice amended (Compromise Motion), filed by W. Grey Steed, Chapter 7 Trustee (Trustee), seeking approval of a compromise and settlement between Debtor's bankruptcy estate and Regina Lambert.  Objections have been filed by a number of creditors:  Cary M. Franklin; Karen A. Franklin, Ph.D; The Franklin Group, LLC; and Daniel D'All (collectively, the Petitioning Creditors[1]) and The Susan L. Miller Special Needs Trust; The Miller Family Trust; The Miller Survivor's Trust; and Adrienne Paige Miller (collectively, the Miller Family Creditors).[2]  The issue to be decided, as defined by the parties, is whether the Compromise Motion is reasonable under the circumstances of the case and should be approved over the objections of creditors.  Because the Court finds that the Trustee failed to meet his burden to show that the proposed settlement is fair and equitable and in the best interest of the estate, the Court denies the Compromise Motion.

The evidentiary hearing of this contested matter was held on April 8 and May 9, 2016. The record consists of stipulations of undisputed facts submitted by the parties on April 1, 2016; sixteen exhibits admitted into evidence; and the testimony of four witnesses: Regina Lambert, W. Grey Steed, Dr. Karen Franklin, and Kelly Sweatman.  Additionally, pursuant to Rule 201 of the Federal Rules of Evidence, the Court takes judicial notice of all documents of record in this bankruptcy case.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

## I.  RELEVANT PROCEDURAL HISTORY & TERMS OF THE PROPOSED SETTLEMENT

This bankruptcy case was commenced through the filing of an Involuntary Petition on January 19, 2015, and an Order for Relief was entered on March 6, 2015.  It is undisputed that

---

[1] Joey Ducote was also a petitioning creditor.  He initially joined in the Petitioning Creditors' objection to the Compromise Motion but did not join in the amended objections or otherwise continue to prosecute any objection to the Compromise Motion.

[2] The Petitioning Creditors and the Miller Family Creditors are referred to collectively as the Objecting Creditors.

1

Debtor held herself out to be an investment advisor and that from 2009 or 2010 she induced her clients, many of whom were family or close friends, to fund what they believed were legitimate investments with a brokerage firm when, in fact, Debtor either lost the invested funds in other ventures personal to her, used the funds for personal living expenses, or spent the funds on herself and her family and friends as part of a lavish lifestyle.  Debtor pleaded guilty to federal charges in January 2016 and was sentenced on April 4, 2016, to 108 months of imprisonment to be followed by three years of supervised release. *See United States v. Stanfill*, E.D. Tenn. Docket No. 3:15-cr-00108-001-RLJ-HBG, Docs. 21, 37.  Debtor's sentence also included a restitution award of $8,817.434.14.  *Id.*, Doc. 37.

Upon notice and hearing on the Petitioning Creditors' motion to appoint a trustee, the Trustee was appointed and continues to serve in that capacity.  As part of his duties and investigation into Debtor's affairs, the Trustee discovered that assets had been transferred from Debtor to Regina Lambert, Debtor's life partner/spouse of more than 25 years.[3]  The Trustee found checks payable to Ms. Lambert from Debtor or one of her companies totaling more than $150,000.00 in addition to gifts of jewelry, trips, clothing, and other items since 2011.  The Trustee believes that these transfers since the beginning of 2011[4] are fraudulent conveyances that potentially would be avoidable and recoverable for the benefit of the bankruptcy estate.

The Trustee and Ms. Lambert's attorney entered into negotiations for a proposal through which Ms. Lambert would repay the bankruptcy estate in settlement of the Trustee's potential fraudulent conveyance claims.  After the Trustee filed his initial Motion to Compromise [Doc. 132], the Petitioning Creditors filed a limited objection to the proposed settlement for the

---

[3] Debtor and Ms. Lambert were married in 2013.

[4] The Trustee acknowledges that he could not pursue transfers to Ms. Lambert before 2011 under the longest applicable statute of limitations.

2

purpose of seeking additional information and an examination of Ms. Lambert [Doc. 141],[5] and the Miller Family Creditors moved for an examination under Federal Rule of Bankruptcy Procedure 2004 [Doc. 144], the scope of which Ms. Lambert opposed.

The parties later agreed to a protective order allowing the Rule 2004 examination along with inspection of financial records and information relative to the proposed settlement. [Doc. 155.] Ms. Lambert's Rule 2004 examination was conducted in November 2015, and on January 22, 2016, the Trustee filed his Amended Motion to Compromise. [Doc. 181.] The Objecting Creditors renewed their objections [Docs. 190, 191], and the Court set the matter for an evidentiary hearing [Doc. 196]. The Trustee continued to negotiate with Ms. Lambert and, on March 31, 2016, submitted a Second Amended Motion to Compromise. [Doc. 205.]

Although no single document of record sets forth in full the proposed terms of the settlement, the parties agreed at the evidentiary hearing to the accuracy of the following recitation of terms as compiled by the Court from the Trustee's motion and two amendments:

- Ms. Lambert will retain a number of personal property items consisting of items over which ownership allegedly[6] is not disputed. The Trustee represents that the personalty to be retained is not valued at more than the $10,000 personal property exemption available to Ms. Lambert under Tennessee law. [Doc. 181, ¶ 7.]

- Ms. Lambert will retain her 2012 Jeep Wrangler automobile. [*Id.* ¶ 7.]

- The marital residence will be sold with the consent of Ms. Lambert, and the estate will receive all but $5,000.00 of the net sale proceeds, which will be paid to Ms.

---

[5] Creditor Nicole Porter joined the Petitioning Creditors' limited objection but later did not renew her objection or otherwise prosecute the objection after the Trustee amended the Motion to Compromise. [Doc. 147.] Four other creditors submitted letters in support of the original Motion to Compromise in January 2016. [Docs. 176, 177, 178.]

[6] The Objecting Creditors made clear at the evidentiary hearing that they question the validity of Ms. Lambert's claim of entitlement to some of the identified personalty.

3

Lambert, the Trustee treating the payment to Ms. Lambert as a homestead exemption under Tennessee law. [*Id.* ¶ 8.]

- Ms. Lambert will pay to the Trustee a portion of legal fees earned by her in Supreme Court litigation concluded in 2015.[7] Ms. Lambert will retain $10,000.00 from the fee award, and the amount to be paid to the Trustee will be calculated as half of the remainder net of income taxes owed by Ms. Lambert on the fees. [*Id.* ¶ 10.]

- Ms. Lambert will forego any right to seek return of jewelry with significant value that was seized[8] by the United States in connection with criminal proceedings against Debtor. [*Id.* ¶ 7.]

- Ms. Lambert agrees to a minimum recovery by the Trustee in the amount of $100,000.00 (the Minimum Recovery). [Doc. 205, ¶ 5.] Ms. Lambert, however, is to receive a credit against the Minimum Recovery from the as-yet-unknown amounts to be recovered by the Trustee for the sale of the marital residence and the legal fee award. In addition, the Trustee proposes to give Ms. Lambert credit against the Minimum Recovery for "liquidation of personal property that is hers individually and/or joint personal property with the debtor when contents of the [marital residence] are sold."[9] [*Id.* ¶ 7.] Finally, Ms. Lambert is also to receive credit for any

---

[7] On October 8, 2015, Ms. Lambert submitted a request in the United States District Court for the Middle District of Tennessee for reimbursement of legal fees and/or expenses in the amount of $149,460.00 related to her role in the civil rights case about legal recognition of same-sex marriage. A Memorandum was entered by the District Court on March 25, 2016, awarding Ms. Lambert fees in the amount of $127,041.00 (85% of the requested fees). Payment of the awarded fees is expected to be imminent. The Objecting Creditors complain that the proposed settlement includes no assignment of the fees and relies solely on Ms. Lambert's promise to pay a portion of the fees.

[8] The United States seized eleven pieces of jewelry, of which Ms. Lambert testified nine were owned by her.

[9] The letter agreement submitted as Trial Exhibit 8 provides: "Ms. Lambert will retain the personal property on the attached list. She will designate additional small value personal property as the real property sells and she moves permanently to another home as reflected on the list." No list was attached to Trial Exhibit 8, although Trial Exhibit 2 (the August 2015 settlement letter agreement) included a list of personalty categorized as "items that belong solely to [Ms. Lambert]" with highlighting to reflect items removed from the marital home when Ms. Lambert moved out

4

amounts that might eventually be paid by the United States to victims of Debtor as a result of the sale of the forfeited jewelry to which Ms. Lambert has waived any right to challenge the forfeiture. [*Id.* ¶ 7.]

- Finally, although not contained in the Compromise Motion itself, a letter agreement signed by Ms. Lambert and the Trustee sets out the deadline for payment of the Minimum Recovery as follows:

> If liquidation of all assets contemplated [by the settlement as outlined above] should not equal $100,000.00 on or before March 1, 2018, then Ms. Lambert shall pay such difference to the trustee within 30 days, i.e., March 31, 2018. If the gross proceeds from the liquidation of the marital home, personal property, jewelry of Ms. Lambert (9 of 11 pieces seized) and the receipt of the fees being sought in the marriage equality litigation case payable to the estate or victims of the debtor's actions under the terms of this agreement equal or exceed $100,000.00, then no further payment shall be owed by Ms. Lambert whatsoever. The $100,000.00 base figure is not the maximum, but only the minimum sum which is contemplated will be received by the estate under this agreement.

[Trial Ex. 8.]

To date, there are claims asserted against the estate in excess of $9,700,000.00. The Trustee has received $59,104.28 through the liquidation of Debtor's one-half interest in a partnership and $6,127.14 from the sale of Debtor's office furnishings.[10] The Trustee attempted to sell the Stone Mill Drive residence, which had been listed for $1,399,000.00, encumbered by a mortgage on which is owing $933,000.00, and subject to payment of real property taxes in the approximate amount of $94,000.00. Since the trial of this matter, because no offers were

---

in June 2015 and items that she plans to take when the house sells; "items that belong solely to [Debtor]"; and "items that belong to both [Debtor] and [Ms. Lambert]" with highlighting of some items presumably intended to indicate that Ms. Lambert had removed or planned to remove the items.

[10] After payment of administrative expenses (with attorney compensation paid only through December 17, 2015), as of April 8, 2016, the Trustee remained in possession of $18,961.43.

5

received on the house, the Trustee has obtained Court approval to auction the house and personal property, such auction to be held on August 11, 2016. [Docs. 223, 225.] The estimated value of Debtor's interest in the personal property and contents of the home is less than $50,000.00.

### III.  RELEVANT FACTS

Ms. Lambert testified that she and Debtor have been in a relationship since 1988. In the late 1990s to the early 2000s, Debtor owned an American Express franchise. In about 2004, Debtor set up her own business, Stanfill Wealth Management, to provide financial investment advising. Ms. Lambert testified that she understood that Debtor no longer operated Stanfill Wealth Management as of 2009. Instead, Ms. Lambert understood that Debtor was involved in home building and an Internet start-up business after 2009.

As for Ms. Lambert's background, she had worked as a paralegal for approximately ten years before attending law school, graduating in 2001. After law school, Ms. Lambert engaged in private practice in Knoxville until 2004, when she went to work for Debtor, who was starting Stanfill Wealth Management and needed legal assistance to terminate her American Express franchise agreement. Ms. Lambert continued to work for Debtor – but not Stanfill Wealth Management. Ms. Lambert teaches one course per semester at the University of Tennessee College of Law and five courses per semester at Tusculum College. For the year 2015, Ms. Lambert earned approximately $16,000.00 for teaching.

Ms. Lambert testified that Debtor had been the primary wage earner in their household for their entire relationship. Ms. Lambert stated that her own income from private practice in the approximate amount of $80,000.00 annually had no real impact on the couple's household finances and that their standard of living did not change from approximately 2000 until Debtor's criminal activity came to light in January 2015 as a result of the raid by the Federal Bureau of

6

Investigation. Ms. Lambert testified that she believed Debtor had funded their household with substantial investments and savings after 2009. Although Ms. Lambert understood by the time of the April 2016 hearing that Debtor's illegal activity began in approximately 2008 or 2009, Ms. Lambert unequivocally denied knowing about Debtor's fraudulent activity or participating in it in any way.

Ms. Lambert explained that the Federal Bureau of Investigation seized eleven items of jewelry, of which she owned nine. Seven of the nine pieces had been purchased before 2010, and one of those seven had been purchased in 2009, with a net cost of approximately $15,000.00. Ms. Lambert estimated the cost of all eleven pieces to be approximately $100,000.00, $78,000.00 of which had been spent before 2009. Ms. Lambert testified that she decided not to pursue any claim to the jewelry once she confirmed that victims of Debtor's fraud would receive recovery from the government's sale of the jewelry. The record does not contain any information about when that decision was made in relation to negotiations with the Trustee except that Ms. Lambert testified that she discussed with the Trustee the issue of restoration[11] of the sale proceeds to the victims. It appears that the seizure occurred on or about January 29, 2015.[12]

### IV. ANALYSIS

The Court's authority to approve or disapprove the Compromise Motion arises from Rule 9019 of the Federal Rules of Bankruptcy Procedure. As a general rule, "[s]ettlements and compromises are favored in bankruptcy as they minimize costly litigation and further parties'

---

[11] Remission or restoration of forfeited property to victims, as applicable here for the crime of money laundering, is governed by 18 U.S.C. § 982(b)(1) and (e)(6).

[12] At the January 30, 2015 hearing on the Petitioning Creditors' motion for appointment of a trustee, the prosecuting Assistant United States Attorney alerted the Court that a seizure warrant had been executed on January 29, 2016, to seize certain items of jewelry.

7

interests in expediting the administration of the bankruptcy estate. . . . At the same time, however, it is essential that every important determination in [bankruptcy] proceedings receive the 'informed, independent judgment' of the bankruptcy court." *In re McInerney*, 528 B.R. 684, 687 (Bankr. E.D. Mich. 2014) (quotation marks and citations omitted). Whether a compromise or settlement should be approved balances upon whether it is "both fair and equitable, and in the best interest of the estate." *In re High Tech Packaging, Inc*., 397 B.R. 369, 671 (Bankr. N.D. Ohio 2008). Such determinations fall within the sound discretion of the bankruptcy court. *See In re Nortel Networks, Inc*., 522 B.R. 491, 510 (Bankr. D. Del. 2014).

The Court must weigh four factors to assess the fairness and equity of the proposed compromise: "(1) the probability of success in the litigation; (2) the difficulties of collecting any judgment; (3) the complexity of the litigation and the expense, inconvenience, and delay necessarily attending it; and (4) the paramount interest of the creditors and a proper deference to their reasonable views in the premises." *In re SCBA Liquidation, Inc*., 451 B.R. 747, 769 (Bankr. W.D. Mich. 2011) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)). "When assessing a compromise, courts need not rule upon disputed facts and questions of law, but only canvass the issues." *Suter v. Geodert*, 396 B.R. 535-548 (D. Nev. 2008) (brackets and citations omitted); *see also In re Age Refining, Inc*., 801 F.3d 530, 541 (5th Cir. 2015) ("In evaluating a Rule 9019 settlement, a bankruptcy court need not conduct a mini-trial to determine the probable outcome of any claims waived in the settlement. Rather, the bankruptcy court must apprise itself of the relevant facts and law so that it can make an informed and intelligent decision." (brackets and citations omitted)).

"The trustee has the burden to establish that a motion to compromise is appropriate with respect to these considerations." *In re High Tech Packaging*, 397 B.R. at 372.

8

> The court is not permitted to act as a mere rubber stamp or to rely on the trustee's word that the compromise is reasonable. Rather, the court possesses 'an affirmative obligation to apprise itself of the underlying facts and make an independent judgment as to whether the compromise is fair and equitable.' At the same time, the judgment of the trustee deserves some deference.

*In re West Pointe Props., L.P.*, 249 B.R. 273, 281 (Bankr. E.D. Tenn. 2000) (quoting *Reynolds v. Comm'r*, 861 F.2d 469, 473 (6th Cir. 1988)) (citations omitted). "The Court 'need not be convinced that the settlement is the best possible compromise. The Court need only conclude that the settlement falls within the reasonable range of litigation possibilities somewhere above the lowest point in the range of reasonableness.'" *Nortel Networks*, 522 B.R. at 510 (quoting *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 833 (Bankr. D. Del. 2008)). A settlement may be approved over objection unless it "falls below the lowest point in the range of reasonableness." *In re Barnwell Cnty. Hosp.*, 491 B.R. 408, 418 (Bankr. D.S.C. 2013) (citations omitted).

At the evidentiary hearing, the Court expressed its concerns about whether the terms of the Compromise Motion – in particular, the credit against the proposed $100,000.00 minimum payment by Ms. Lambert for property seized by the United States and subject to forfeiture – were fair and equitable and in the best interests of the creditors. Those concerns were not alleviated by the proof introduced; in fact, after assessing the testimony and the credibility of the various witnesses, the Court finds that Trustee has failed to meet his burden to prove that the Compromise Motion is fair and equitable to creditors or that the Compromise Motion is in the best interest of the estate.

Based on the deadlines set for notice by the government and assertion of a claim by any claimant by 18 U.S.C. § 983(a)(1)(A)(i) and (a)(2), the deadline for Ms. Lambert to assert a claim likely would have been no later than the end of May 2015. Although the record is devoid of information about when the Trustee alerted Ms. Lambert about his potential claim against her,

9

Ms. Lambert testified that the Trustee first began discussions with her in the summer of 2015. The specific proposal for Ms. Lambert to waive any right to claim the seized jewelry did not appear as an element of the proposed settlement until January 2016, well after any deadline for raising a claim to the seized jewelry. The Court surmises from all the testimony that Ms. Lambert waived her right to assert a claim to the jewelry well before such became a topic for inclusion in the proposed settlement.

Furthermore, it is impossible to determine at this stage whether and to what extent proceeds from the sale of the forfeited jewelry might be paid to Debtor's victims. Applicable regulations provide that various costs must be paid before it can be determined what amount might be available for victims, including costs incurred by the United States Marshals Service and the Federal Bureau of Investigation incident to the forfeiture, sale, or other disposition of the property, such costs to include but are not limited to storage costs and brokerage and other sales-related costs. *See* 28 C.F.R. § 9.9.

The personal property to be sold at auction is another area of uncertainty in this proposed settlement because Trial Exhibit 2 does not include the entire universe of personal property to be sold for the benefit of the estate. The sale of the house, which has now progressed to a planned auction, creates another uncertainty with the settlement as proposed because it cannot be known whether any recovery might be realized from the auction.

As for the amount of Ms. Lambert's potential liability to the estate, such is also uncertain. Ms. Lambert did not deny that she received $176,000.00 from the Stanfill Wealth Management account during the relevant time period or that she enjoyed the benefits of various international trips during the relevant time period. In fact, the Trustee and Objecting Creditors stipulated that the "Trustee has identified . . . checks payable to [Ms.] Lambert since the beginning of 2011

totaling an amount not less than $150,000.00 [and that] . . . [D]ebtor provided or gave to [Ms.] Lambert gifts of trips, jewelry, clothing and other support in that same period of time." [Doc. 209, p. 2.] The Objecting Creditors assert that Ms. Lambert also might have received $1,000,000.00 from Debtor as security for Ms. Lambert's future following an alleged separation and reconciliation between Debtor and Ms. Lambert in or about 2012.  Finally, Ms. Lambert's sister, Dr. Karen Franklin, questioned whether Ms. Lambert also possesses additional personal property over what she disclosed to the Trustee, including significant other valuable jewelry that Dr. Franklin has seen.

For his part, the Trustee acknowledged that without obtaining and analyzing credit card and other bank and brokerage account statements, all of which would result in significant expense to the estate, he cannot determine the amount of loss as a result of Debtor's fraudulent conveyances to Ms. Lambert.  Nonetheless, the Trustee argues that under all the circumstances, the negotiated settlement in its last form (with a minimum payment of $100,000.00 after various possible credits) is in the best interest of the estate and creditors.  The Trustee and Ms. Lambert also point out that the Trustee is not precluded by the proposed settlement from pursuing any undisclosed assets.  Specifically, the letter agreement dated March 3, 2016, contains the following provision:

> The settlement compromises all claims which the estate holds, known or unknown, for all legal or equitable rights of any kind whatsoever.  However, should additional assets be discovered related to the Jacqueline Stanfill bankruptcy estate that were not disclosed by Stanfill nor disclosed in the financial statement of Ms. Lambert, and the assets are of meaningful value, and Ms. Lambert asserts or has a right to assert an interest therein, the Trustee would not be precluded from asserting a claim to said assets nor would he be precluded from asserting an avoidance type action (whether via state or bankruptcy law) against Ms. Lambert's interest in same if the facts and circumstances permit such an action.  It being the understanding of the parties, and their intent hereto, that the Trustee is making this settlement, in part, based on the known assets of Ms.

11

>Lambert and ability to collect on any judgment that might be awarded to him if the parties did not settle their disputes.

[Tr. Exh. 8.]

Notwithstanding the many uncertainties regarding property to be sold and credits to be given, the Court recognizes the minimum payment required from Ms. Lambert as of March 31, 2018. Such payment, however, will depend at that time on Ms. Lambert's ability to pay and another uncertainty that was addressed during the trial of this matter – i.e., whether Ms. Lambert might file bankruptcy to attempt to discharge any liability owed to the estate by settlement or otherwise. Specifically, although the Trustee points to the specter of a bankruptcy filing by Ms. Lambert as a motivating factor for settling the matter now for a negotiated amount, the evidence made clear that Ms. Lambert has not waived her right to file bankruptcy at any time in the future, including when payment of up to $100,000.00 comes due under the proposed settlement in March 2018. Notably, the parties have not included in the negotiated terms any provision that a bankruptcy filing by Ms. Lambert would return the parties to their original postures concerning the Trustee's fraudulent conveyance claims.

The question of whether any liability of Ms. Lambert to this estate could be discharged in her own bankruptcy is also far from certain. Further, the Objecting Creditors challenge whether Ms. Lambert would be entitled in her own bankruptcy filing to exempt her interest in the house or the portion of legal fees that she negotiated to keep in connection with the proposed settlement. Finally, notwithstanding Ms. Lambert's denial of knowledge that her family members and some close friends were investing with Debtor, the Objecting Creditors assert that more investigation is needed to determine what part, if any, that Ms. Lambert played in encouraging or inducing those investments with her spouse.

### A. Probability of Success in Litigation; Difficulties Collecting a Judgment; and Complexity, Expense, Inconvenience, and Delay of Litigation

As stipulated by the Trustee and Objecting Creditors:

The Trustee has identified as part of his investigation from Regions Bank records of the debtor, from the accounts owned or controlled by the debtor, checks payable to Regina Lambert since the beginning of 2011 totaling an amount not less than $150,000.00. Additionally, the Trustee is aware that the debtor provided or gave to Regina Lambert gifts of trips, jewelry, clothing and other support in that same period of time.

The Trustee and his counsel have asserted that the monies and property given by the debtor to Regina Lambert since the beginning of 2011 are fraudulent conveyances that would be avoidable and recoverable by the Trustee for the estate pursuant to Section 548 of the Bankruptcy Code and/or the Uniform Fraudulent Conveyance Act enacted in Tennessee at Tennessee Code Annotated § 66-3-101 and/or 66-3-301 et seq.

[Doc. 209, ¶¶ 5-6.] Additionally, Ms. Lambert acknowledged during her testimony that she received approximately $176,000.00 from Debtor's Stanfill Wealth Management account and that the Trustee could, in fact, bring an adversary proceeding against her to avoid and recover potentially fraudulent transfers.

Fraudulent transfers are avoidable under the Bankruptcy Code:

(a)(1) The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily –

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)(i) received less than a reasonably equivalent value[13] in exchange for such transfer or obligation; and

---

[13] For the purposes of § 548, the Bankruptcy Code defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor[.]" 11 U.S.C. § 548(d)(2)(A). "Value can be in the form of either a direct economic benefit or an indirect economic benefit . . . [and] can come from one other than the recipient of the payments[.]" *Lisle v. John Wiley & Sons, Inc. (In re Wilkinson)*, No. 05-5744, 196 F. App'x 337, 342 (6th Cir. Aug. 17, 2006). When determining reasonably equivalent value, the court "should first determine whether the debtor

13

    (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation[.]

11 U.S.C. § 548(a)(1).[14] Transfers may also be avoided under Tennessee's fraudulent conveyance statute:

> Every gift, grant, conveyance of lands, tenements, hereditaments, goods, or chattels, or of any rent, common or profit out of the same, by writing or otherwise; and every bond, suit, judgment, or execution, had or made and contrived, of malice, fraud, covin, collusion, or guile, to the intent or purpose to delay, hinder, or defraud creditors of their just and lawful actions, suits, debts, accounts, damages, penalties, forfeitures; or to defraud or to deceive those who shall purchase the same lands, tenements, or hereditaments, or any rent, profit, or commodity out of them, shall be deemed and taken, only as against the person, such person's heirs, successors, executors, administrators, and assigns, whose debts, suits, demands, estates, or interest, by such guileful and covinous practices, shall or might be in any wise disturbed, hindered, delayed, or defrauded, to be clearly and utterly void; any pretense, color, feigned consideration, expressing of use, of any other matter or thing, to the contrary notwithstanding.

Tenn. Code Ann. § 66-3-101. Additionally, the Tennessee Fraudulent Transfer Act (TFTA) provides, as to present and future creditors:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
>   . . . .
>
>  (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
>   (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

---

received any value in the exchange. If so, the court should determine if the value received was reasonably equivalent." *Id.* at 341.

[14] Correspondingly, "to the extent that a transfer is avoided under section . . . 548 . . . , the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from – (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made[.]" 11 U.S.C. § 550(a)(1).

14

>> (B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Tenn. Code Ann. § 66-3-305. The TFTA also provides, as to present creditors:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value[15] in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Tenn. Code Ann. § 66-3-306(a).

The burden of proving actual or constructive fraud would be on the Trustee; however, there is authority to support a claim that transfers into an account for payment of household expenses with a spouse may be determined to be constructively fraudulent. *See, e.g., Hagan v. Goldstein (In re Goldstein)*, 428 B.R. 733 (Bankr. W.D. Mich. 2010).

In support of the Compromise Motion, the Trustee explained that he has not sought to obtain all bank records, stating that such was impractical because of the associated expense and the time it could take to obtain a judgment. With respect to Ms. Lambert's assets, the Trustee testified that he ran an asset search on her that resulted in no findings and that she has provided him with an inventory of the property that she personally owns and still possesses. The Trustee

---

[15] For the purpose of the these Tennessee statutory provisions, Tennessee Code Annotated defines "value" as:

> (a) Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.
>
> (b) For the purposes of §§ 66-3-305(a)(2) and 66-3-306, a person gives a reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale or execution of a power of sale for the acquisition or disposition of the interest of the debtor upon default under a mortgage, deed of trust, or security agreement.
>
> (c) A transfer is made for present value if the exchange between the debtor and the transferee is intended by them to be contemporaneous and is in fact substantially contemporaneous.

Tenn. Code Ann. § 66-3-304.

15

also testified that although Debtor asserted her rights under the Fifth Amendment and did not answer most questions at her meeting of creditors, the Trustee believed Debtor and Ms. Lambert were candid with him when he questioned them with their attorneys present prior to the meeting of creditors; that Ms. Lambert has cooperated with him and agreed to sell the couple's residence; and that she has agreed to move back into the residence to help maintain it while the Trustee attempts to sell it. The Trustee also cited as a reason for not pursuing litigation the possibility that Ms. Lambert could file for bankruptcy if he obtained a judgment against her and that the judgment could potentially be dischargeable.

On cross examination, however, the Trustee testified that he has not talked to an attorney about representing him in an adversary proceeding against Ms. Lambert on a contingency-fee basis. He also acknowledged that he believes the Federal Bureau of Investigation seized payroll and Stanfill Development records that he has not yet obtained; that he got only two years of records from Fidelity; that he did not obtain any records from WeScore; that he did not obtain any of the American Express records; and that he only got limited bank records from Debtor's Spontivity account even though Ms. Lambert received monies from Spontivity in December 2013, a fact that was confirmed by the testimony of Ms. Sweatman, Ms. Lambert's and Dr. Franklin's niece who worked for Debtor assisting with payroll and running errands for approximately two years until January 2015.[16]

With respect to the residence, the Trustee acknowledged that Ms. Lambert did not originally cooperate with him because she did not agree to a lower listing price and that the estate has been paying the insurance on the residence and is currently losing approximately

---

[16] Ms. Sweatman testified that Ms. Lambert came into Debtor's office three or four times in the two years between January 2013 and January 2015 and received checks from Debtor written on the Stanfill Wealth Management and Spontivity bank accounts. She also indicated that Ms. Lambert charged purchases to the Stanfill Wealth Management American Express credit card account.

$1,000.00 monthly to maintain it.[17] He also testified that while he could have attempted to sell the residence without Ms. Lambert's assistance or approval under 11 U.S.C. § 363(h), he decided against proceeding in that vein after discussions with his attorney. Further, with respect to Ms. Lambert's personal property, the Trustee testified that he has inspected neither the residence nor Ms. Lambert's personal property to determine what property Ms. Lambert actually possesses.

Based on the testimony, the Court is not convinced that it would be cost prohibitive to file an adversary proceeding under the statutes cited above, or that the adversary proceeding would be unnecessarily complex. Because there are still a great number of records that have not yet even been examined, the Court also cannot find that there is a greater or lesser probability of success if an adversary proceeding were to be filed. Indeed, given the stipulations and other testimony at the hearing, it appears that the Trustee is likely to be successful to the extent of at least $150,000.00.

Additionally, Ms. Lambert's threat that she will file for bankruptcy protection if the Trustee obtains a judgment against her is unpersuasive as a basis for approval of this proposed settlement. As the Objecting Creditors argued, in a bankruptcy case, Ms. Lambert would be entitled to keep only exempt property and the rest of her assets would be liquidated; thus, she could potentially fare much worse in a bankruptcy than under the proposed settlement, weighing against her threat that she "absolutely" will file. The Court also notes that absent the specter of Ms. Lambert filing bankruptcy, it appears that she is significantly underemployed. As evidenced by her testimony concerning her earnings in private practice and the fee she earned in the recent, very successful Supreme Court litigation, Ms. Lambert certainly has the ability to practice law

---

[17] The Court learned during the May 9 hearing that Ms. Lambert had agreed to move back into the house, in part because an occupied home is easier to sell on the real estate market. Ms. Lambert, however, earlier refused to continue paying the $800.00-per-month insurance premium on the house because of her own financial difficulties. No evidence was presented concerning whether Ms. Lambert is living in the house without paying the insurance or without incurring any reductions in her recovery from the sale as monthly rent.

17

and earn appreciably more income than the $16,000.00 annual income she has earned from teaching. Although increased income is as uncertain as most other matters related to the Compromise Motion before the Court, Ms. Lambert's potential, currently untapped earning capacity is a consideration for the Court when analyzing the difficulties of collecting a judgment.

### B. Interests of Creditors and the Estate

"While the desires of the creditors are not binding, a court 'should carefully consider the wishes of the majority of the creditors [as a factor bearing on the wisdom of the compromise].'" *Connecticut Gen. Life Ins. Co. v. United Cos. Fin. Corp. (Matter of Foster Mortg. Corp.)*, 68 F.3d 914, 917-18 (5th Cir. 1995) (quoting *Davis v. Jackson (In re Transcontinental Energy Corp.)*, 764 F.2d 1296, 1299 (9th Cir. 1985)). In *In re West Pointe Properties*, 249 B.R. at 281, Judge Stair noted that the First Circuit's list of factors is similar to the four factors he applied. Notably, the First Circuit described the "so-called 'best-interests' standard" as "the probability of success were the claim to be litigated – given the legal and evidentiary obstacles and the expense, inconvenience and delay entailed in its litigation – measured against the *more definitive, concrete and immediate benefits attending the proposed settlement*." *Id.* at 281-82 (emphasis added) (quoting *Hicks, Muse & Co., Inc. v. Brandt (In re Healthco Int'l, Inc.)*, 136 F.3d 45, 50 (1st Cir. 1998). The Compromise Motion here does not propose "definitive, concrete, [or] immediate benefits" to the estate and creditors.

### V. CONCLUSION

Simply, because of the significant uncertainties on both sides of the equation, the Court cannot say that the proposed settlement weighs more favorably for the benefit of the estate than the probability and costs of success in fraudulent conveyance litigation or collection of a judgment against Ms. Lambert. Thus, the Trustee has failed to meet his burden under Rule 9019.

For these reasons, the Trustee's Second Amended Motion to Compromise shall be denied. An Order consistent with this Memorandum will be entered.

FILED:  July 8, 2016

                                        BY THE COURT

                                        */s/ Suzanne H. Bauknight*

                                        SUZANNE H. BAUKNIGHT
                                        UNITED STATES BANKRUPTCY JUDGE